UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAYTON PULMONARY | : | Case No. 3:10-cv-128 |
| REHABILITATION CENTER, INC., *et al.*, | : | |
| | : | Judge Timothy S. Black |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| MERIDIAN HEALTHCARE | : | |
| GROUP, INC., *et al.*, | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This civil case is before the Court following a trial to bench on October 3, 2011.

(Doc. 63). Following trial, the parties filed Trial Briefs with proposed Findings of Fact

and Conclusions of Law. (Docs. 65, 66). Thereafter, both parties filed Reply Briefs.

(Docs. 68, 69). Pursuant to Fed. R. Civ. P. 52, the Court now sets forth and enters its

Findings of Fact and Conclusions of Law.

**I. FINDINGS OF FACT**

1. Doctors Rajesh Patel ("Dr. Patel") and Anuj Goyal ("Dr. Goyal") have operated

Dayton Respiratory Center ("DRC") since before 2004. DRC is a medical practice

providing pulmonary critical care and sleep medicine services.

2. In January 2004, Meridian Healthcare Group, Inc. ("Meridian") and DRC

negotiated a business arrangement whereby Meridian would provide pulmonary

rehabilitation services to DRC's patients pursuant to a pulmonary services agreement

("PSA"). To facilitate the proposed 2004 PSA, Dr. Patel and Dr. Goyal formed Dayton

Pulmonary Rehabilitation Center, Inc., ("DPRC") as the entity providing the pulmonary

rehabilitation services to DRC patients by and through its contract with Meridian. Meridian employees would actually perform the pulmonary rehabilitation services.

3.  Before formally entering into the 2004 PSA with Meridian, Dr. Goyal reviewed the proposed agreement and made several handwritten notations in the margins of the proposed agreement, including a notation that DPRC would pay Meridian 70% of all funds collected, generally within the first seven days of the following month.  After making and initialing the handwritten changes to the proposed PSA, Dr. Goyal signed it and mailed it to Meridian.

4.  Thereafter, Tom Futch, the sole owner of Meridian, sent a letter to Dr. Goyal enclosing "a clean copy" of the 2004 PSA between DPRC and Meridian that reflected "the changes [Dr. Goyal] had requested."  The clean PSA enclosed by Futch was assembled by revising the initial proposed agreement to incorporate Dr. Goyal's handwritten changes, copying Dr. Goyal's signature page, and attaching it to the revised copy.

5.  Under the 2004 PSA, patients of DRC who needed pulmonary rehabilitation services would be offered those services through DPRC.  If the patient agreed, Meridian's employees would perform the actual rehabilitations services, and would bill for those services on behalf of DPRC, through DPRC's established billing company, Glenwood Systems, Inc. ("Glenwood").  Each month Glenwood sent a report to DPRC showing all amounts actually collected for services, and DPRC would deduct 4.5% in billing costs that were paid to Glenwood, and then sent Meridian 70% of the remaining amount.

2

6.  Initially, the 2004 PSA applied only to one location, DPRC's main facility in Englewood, Ohio.  However, because of the success of the program, the 2004 PSA was amended twice in 2006 to include facilities in Centerville, Ohio and Huber Heights, Ohio.

7.  In the summer/fall of 2008, Futch contacted DPRC and requested a new PSA to obtain certain financing and ostensibly to comply with certain federal laws.  In approximately early October 2008, Futch mailed a proposed copy of a new PSA to DPRC.  The new PSA proposed eliminating the previous revenue-based compensation structure, *i.e.*, the 70/30 split of monthly collections, and implementing a new fixed-fee based compensation structure in which Meridian would bill DPRC for all services performed and DPRC would be responsible for payment of those fees regardless of the ultimate amount collected.

8.  Essentially, under the fixed-fee based payment structure, Meridian would charge DPRC a predetermined rate for each service Meridian provided to patients.

9.  The proposed new PSA also included a provision permitting Meridian to freely assign the PSA.

10.  Dr. Goyal and Dr. Patel were aware of and concerned about the proposed fixed-fee payment structure, as opposed to the percentage based payment structure, because they did not know whether DPRC would be as profitable under the new compensation structure.

11.  At the time Futch mailed the proposed new PSA to DPRC, Dr. Goyal was out of town.  Futch contacted Dr. Patel and requested that Dr. Patel execute the new PSA

3

immediately as a personal favor.  When Dr. Patel did not immediately execute the PSA,

a Meridian employee, Connie Hurt, informed Dr. Patel that she would be in Dayton and

that Futch requested that she meet with him to get the 2008 PSA signed.

12.  The next day, Hurt traveled to Good Samaritan Hospital where Dr. Patel was

working.  Dr. Patel met Hurt in the lobby of the hospital, reviewed the new proposed

PSA, made several handwritten revisions and notations on the draft, and signed the

agreement.

13.  Although Dr. Patel claims a handwritten notation with regard to the

compensation provision, the Court does not find such testimony credible in light of other

evidence in the record.  The Court finds that DPRC assented to the fee-based

compensation structure, even though it generally expected that application of the fee-

based compensation structure would nevertheless result in an approximately 70/30 split of

proceeds.  Dr. Patel did not retain a copy of the signed 2008 PSA, and Hurt left with the

only copy.

14.  To account for DPRC's concern about the change in payment structure and

whether or not the 2008 PSAs would be profitable for DPRC, Dr. Patel required Meridian

to include a 30-day termination provision.

15.  Thereafter, just as had been performed with the 2004 PSA, Futch revised the

PSA by incorporating the changes requested by Dr. Patel, including the 30-day

termination provision.  Futch then removed Dr. Patel's signature page from the document

he signed at the hospital, copied it, signed it and attached it to the revised PSA

4

(hereinafter the "2008 PSA").  Futch also appended copies of that same signature page to

separate PSAs governing two other locations.

16.  In the week or weeks after Dr. Patel signed the 2008 PSA in the hospital

lobby, Futch sent a letter to Dr. Patel attaching a copy of the contract "that incorporate[d]

the changes that you [Dr. Patel] had marked on the Agreement last week" and specifically

referencing addition of the 30-day termination provision that read:

> *Not withstanding the above, either party may terminate the
> Agreement at any time on thirty (30) days advance written notice
> should financial conditions make the continued provision of the
> Services unfeasible.*

Again, the 30-day termination provision was placed in the contract on Dr. Patel's request

to account for DPRC's concern about the change in the payment structure and whether or

not the 2008 PSAs would be profitable for DPRC.

17.  The final 2008 PSA attached to Futch's letter appended Dr. Patel's

photocopied signature and set forth the fee-based compensation provision to which all

parties mutually assented.  Notably, nothing in the 2008 PSAs agreed upon by the parties

provides that DPRC and Meridian would be compensated on a 70/30 split or that the

payment structure was based upon amounts actually collected by DPRC.  The 70/30 split

simply remained the parties' expectation upon application of the fee-based structure.  The

2008 PSAs also do not provide that Meridian must pay a 4.5% billing fee.

18.  Further manifesting assent to the 2008 PSAs, on December 10, 2008, Dr.

Goyal signed an addendum to the 2008 Englewood PSA, which amended it to set forth

the equipment Meridian had at the office.  The addendum directed Dr. Goyal to "attach the list of equipment to your copy of the Agreement to complete the document."  On that same date, Dr. Goyal signed an similar addendum to the 2008 Centerville PSA, again, amending the PSA to set forth the equipment Meridian had at that office location.  The addendum to the 2008 Centerville PSA also directed Dr. Goyal to "attach the list of equipment to your copy of the Agreement to complete the document."

19.  On December 16, 2008, Meridian and Defendant PulmoRehab executed an Asset Purchase Agreement whereby Meridian sold all of its assets to PulmoRehab, including the 2008 PSAs for the Englewood and Centerville locations.[1]

20.  As of December 16, 2008, both Futch and Hurt became employees of PulmoRehab and continued to be DPRC's only points of contact for administration of the pulmonary service programs in Centerville and Englewood.

21.  Beginning in January 2009, and continuing throughout 2009, PulmoRehab billed DPRC under a fee-based structure agreed upon by the parties.  Dr. Patel and Dr. Goyal consistently questioned the invoices because they did not comport with the parties' expectation that the fee-based compensation structure would effectively result in a 70/30 split of proceeds from the pulmonary rehabilitation services provided.

22.  Manifesting further assent to the 2008 PSAs, and specifically the fee-based compensation structure, on May 1, 2009, DPRC and PulmoRehab executed additional

---

[1]  The Huber Heights location was been shut down in December 2008, and no claim for any services at that location has been made in this lawsuit.

amendments to 2008 PSA for the Centerville and Englewood locations by reducing some of the fixed fees that PulmoRehab was charging DPRC.

23.  As early as June 2009, Dr. Goyal informed Futch that the clinics should be discontinued if DPRC's expectations that the fee-based structure would result in a 70/30 split of proceeds.  Again, DPRC possessed the contractual right to terminate the 2008 PSAs altogether upon providing adequate notice.

24.  On November 30, 2009, Dr. Goyal sent Futch a payment in the amount of $33,822.77, along with a handwritten calculation of how that amount was reached for the period of January 2009 through November 30, 2009.  Following the calculation on the handwritten note was the statement "Paid in full."  The memo on the face of the check issued with the handwritten note stated, at the least, "Rehab Services Final Payment," indicating and providing notice that the check was offered by DPRC as full payment for rehabilitation services between January 1, 2009, through November 30, 2009.

25.  PulmoRehab cashed the $33,822.77 check.

26.  PulmoRehab's detailed invoices for the month of December 2009 show that, under the fee-based compensation structure, DPRC owed PulmoRehab $25,671.30 for services performed at the Englewood location, and $2,029.76 for services performed at the Centerville location.

27.  DPRC sent PulmoRehab a check on February 8, 2010, in the amount of $18,103.10 and marked "Paid in Full."  Again, the amount of the check represented 70% of the amounts collected by DPRC in December 2009 and January 2010, the amount

7

DPRC genuinely believed it owed.  PulmoRehab refused to cash that check and returned it to DPRC because it was made payable to Tom Futch and Meridian (just as all previous checks) and because it was marked "paid in full."

28.  In addition to the PSAs between DPRC and Meridian, DPRC and Meridian had a oral lease agreement whereby Meridian paid $600 per month toward the rent for the office space at the Englewood location ("Englewood lease").  This rental agreement was necessitated by the fact that DPRC needed to rent additional space to provide the pulmonary rehabilitation services offered by Meridian.  DPRC rented the additional space in reliance upon Meridian's promise to pay $600 of the monthly rent for that additional space.

29.  Meridian paid rent for the Englewood location throughout the entire period of the 2004 PSA was in effect and continued paying rent after the 2008 PSAs went into effect until December 2008.  In other words, Meridian and/or PulmoRehab failed to reimburse DPRC $600 for renting the additional space at the Englewood location throughout calendar year 2009.

30.  Meridian also signed a separate lease agreement with Plaintiff GYP Holdings, LLC ("GYP Holdings"), dated November 1, 2008, to rent office space at a separate Centerville location where Meridian intended to open a home health care center ("Centerville lease").  The Centerville lease was  expressly assigned to PulmoRehab in the asset purchase agreement between Meridian and PulmoRehab.

8

31. On June 24, 2009, Meridian informed GYP Holdings that it was unable to get necessary permits for the home health care center, notified GYP Holdings that it would not exercise its option to renew the lease past the present lease term (ending October 31, 2009), and, in fact, requested that GYP Holdings consent to an early termination of the lease. GYP Holdings never agreed to early termination of the Centerville lease.

32. Meridian stopped paying rent under the Centerville lease after July 2009, though it continued to occupy the premises until January 8, 2010.

33. The parties ultimately agreed to close the remaining clinics at then end of December 2009.

## II. CONCLUSIONS OF LAW

1. The 2008 PSAs offered by PulmoRehab are admissible duplicates pursuant to Fed. R. Evid. 1003. Even assuming the 2008 PSAs are not duplicates of the original, they are admissible pursuant to Fed. R. Evid. 1004(a).

2. Based on the evidence presented, and the Court's assessment of the credibility of witnesses, the Court concludes that all parties were aware of and assented to the switch to a fee-based compensation structure, even though the both parties expected that application of the fee-based structure would generally provide the same end result as the previous compensation structure, *i.e.*, application of the fee-based structure would roughly amount to a 70/30 split of proceeds.

3. DPRC's understanding that the 70/30 split was no longer the compensation structure is evidenced by repeated statements of DPRC representatives that it understood

9

the new payment structure could be 70/30 "or better."  Certainly, under the former 70/30

payment structure, there was no way for DPRC to earn more than 30 percent of amounts

collected.

4.  The parties' assent to the fee-based structure is further evidenced by inclusion

of the 30-day termination provision in the new agreement.  Certainly, as opposed to the

straight 70/30 split, the fee-based structure was not absolute and this otherwise unknown

understandably made DPRC leery of the new agreement.  Based on such wariness, the

parties negotiated a 30-day termination clause in case the new compensation structure, in

its actual application, did not meet the parties' expectations.[2]  In other words, Plaintiff

agreed and assented to use of a fee-based structure on the condition that if application of

that pay structure did not result in a roughly 70/30 split, DPRC could cancel the contract

in 30-days.  There simply is no credible evidence to otherwise explain inclusion of the 30-

day termination provision, especially when Meridian did not include such a provision in

any other contract.

5.  The parties' assent to the fee-based structure is further evidenced by the parties'

subsequent amendments to the 2008 PSA, particularly the May 2009 amendments to the

actual fees.  If the parties were simply operating under a 70/30 split of collections, the

fees would be irrelevant, and there would have been no reason to amend them.  Instead,

the amendment shows the parties understanding that the compensation structure was fee-

---

[2]  In fact, Dr. Patel essentially testified to that extent, stating: "I made sure that I wrote at least the compensation structure should not change and if the contract, after through review, was not acceptable to us, we had a 30-day out."  (Doc. 63, PAGEID 1419).

based and that PulmoRehab was attempting to lower the fees to meet the parties' initial expectation and to avoid DPRC's termination of the 2008 PSA under the negotiated termination provision.

6.   Accordingly, based on all the evidence, the Court concludes that all parties knew of the proposed fee-based pay structure, expected that the fee-based pay structure should result in a roughly 70/30 split of proceeds, but recognized the risk that it may not. Thus, the parties mutually assented to the fee-based compensation structure as provided for in the 2008 PSAs produced by PulmoRehab and operated under the term of the 2008 PSAs.

7.   DPRC asserts that it satisfied any debt owed from January 2009 through November 30, 2009 through accord and satisfaction.[3]  Both parties cite Ohio law regarding accord and satisfaction.  "An accord is a contract between a debtor and a creditor in which the creditor's claim is settled in exchange for a sum of money other than

---

[3] Under Florida law, an "[a]ccord and satisfaction results when there is an existing dispute as to the proper amount due from one party (the debtor) to another party (the creditor) and the parties mutually intend to effect settlement of the existing dispute by a superceding agreement and the debtor tenders, and the creditor accepts, performance of the new agreement in full satisfaction and discharge of the debtor's prior disputed obligation." *Republic Funding Corp. of Florida v. Juarez*, 563 So.2d 145, 146-47 (Fla. App. 1990) (citing *Jacksonville Electric Authority v. Draper's Egg and Poultry Company*, 557 So.2d 1357 (Fla.1990) (stating that "[d]ischarge of a claim by accord and satisfaction means 'a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such performance by the claimant as full satisfaction of his claim'")(further citations omitted).

"The issue of whether parties have reached an accord and satisfaction is generally a question of fact." *Myers v. Miller*, 581 So.2d 904, 905 (Fla. App. 1991) (citing *Canny v. Michael Saunders & Co.*, 543 So.2d 433 (Fla. 2d DCA 1989)).  Further, "[a]n accord and satisfaction agreement is often implied from the acts of the parties after the resolution of disputed issues of fact by trial."  *Republic Funding*, 563 So.2d at 147.

"An accord and satisfaction results as a matter of law only when the creditor accepts payment tendered on the expressed condition that its receipt is to be deemed to be a complete satisfaction of a disputed issue."  *Id.*; *see also St. Mary's Hosp., Inc. v. Schocoff*, 725 So.2d 454 (Fla. App. 1999).  Absent "a dispute and a finding or admission that the parties intended to, and did, reach an accord and agreed to resolve that dispute by payment of an agreed amount, a partial payment of a legal obligation does not act to satisfy and discharge that obligation."  *Id*.

that which is allegedly due. Satisfaction is the performance of that contract." *Allen v.*

*R.G. Indus. Supply*, 66 Ohio St.3d 229, 231, 611 N.E.2d 794 (Ohio 1993).

8.  An accord and satisfaction occurs where the debtor and creditor have "a *bona*

*fide* dispute over an unliquidated demand and the debtor tenders an amount less than the

amount in dispute, upon the express condition that it shall be in full [satisfaction] of the

disputed claim." *Id*.  In that situation, the creditor must "accept the amount tendered upon

the terms of the condition, unless the condition be waived, or he must reject it entirely, or

if he has received the amount by check in a letter, he must return it." *Id.* (citations

omitted).

9.  "At common law, an accord and satisfaction is accomplished when a creditor

accepts and deposits a check which the debtor offers as full payment for an unliquidated

or disputed debt. * * * By cashing the check, the creditor manifests assent to the terms of

a new contract which extinguishes the debtor's prior contractual obligation." *Id*. at

231-32 (internal and external citations omitted).

10.  A "debtor must make it clear, in the eyes of a reasonable person, that the

check is being tendered only on condition that it is taken in full payment of the disputed

claim." *Id*. at 233.  This can be shown:

> either by evidence of an agreement between the parties or by the
> words appearing on the check itself. If the debtor and creditor
> (tortfeasor and injured party) reached a clear agreement that the
> debtor would send the creditor a check in exchange for a full
> discharge, an accord may be proved by evidence that the debtor's
> offer was expressly conditional and that the condition was a full
> release. If the creditor subsequently cashes the check, there is a

12

> satisfaction. In the alternative, a debtor can send the creditor a check
> on which is printed a clear and express notice that negotiation of the
> check by the creditor fully releases the debtor from further liability.
> If the creditor negotiates such a check, an accord and satisfaction is
> reached. Thus, the reasonable-notice requirement can be proved
> either by extrinsic evidence of agreement or by sufficient notation on
> the check.

*Id*.

11.  Here, there was a good faith dispute between the parties regarding the amount

owed.  Throughout 2009, Dr. Goyal and Dr. Patel continuously expressed their intent to

close the pulmonary services programs unless the parties could somehow reach a

resolution so that the amounts finally invoiced each month reflected a roughly 70/30 split

in proceeds.  The parties negotiated and corresponded in an effort to resolve DPRC's

dissatisfaction with application of the fee-based compensation structure and to avoid

termination of the 2008 PSAs, which DPRC had the contractual right to do pursuant to

the 30-day termination provision.

12.  In December 2009, the negotiations between the parties to try to save the

business relationship reached an impasse, after what DPRC perceived as Futch's stalling.

Dr. Goyal wrote to Tom Futch that he was "going to hold off on paying the invoices until

it is clear to both [parties] how much [DPRC] actually owe[d.]"  (Ex. PX-26, Bates T-22).

In response, Tom Futch wrote:

> Anju, we have not been paid for October or November services and
> need a payment on the account prior to year end.  As you know we
> have paid salaries for Oct/Nov/Dec.
>
> We are not going to be able to get to a 70/30 % ratio.  The Glenwood
> data showed that your collections were greater than our charges.

This is despite the absence of collection of significant patient co-pays.

(PX26, Bates T-22).

13.  In response to Futch's email, Dr. Goyal wrote:

We continued the clinic only after both you and Connie assured Dr. Patel that the changes would work in our favor and we would be better off than the previous contract.  We are still working on that understanding.  The Glenwood data for November (after billing costs) does not show it to be higher than the Meridian bill that we just received.  If we pay the last two invoices we will have paid Meridian much more than our agreement.  I understand you have incurred costs but so has our practice an we need to stick to our agreement or we would have never continued the clinic.

I and Dr. Patel have tried very patiently, on a weekly basis, to get this discrepancy resolved an you continued to assure us that things will get worked out and we should continue.  We would have closed the clinic a long time ago if you even once told us that things were not going to be in our favor.  I have met and or spoke on the phone to both Connie and Tom A. and have spent countless hours in a attempt to resolve this discrepancy.

*I am happy to look at our collections for the year, take 70% and subtract billing costs, and subtract what we have already paid you and send you any remaining money.  Anything further than that will have to be worked out between you and Dr. Patel.*

Also, per your lease in Centerville with GYP Holdings, the company has never received the last four months rent and Meridian continue to occupy the space without paying rent.

Tom, we have no problem closing the clinic if that is what is what is in the best interest of Meridian, but we cannot pay more than our agreement.

(Ex. PX-26, Bates T-23) (emphasis added).

14.   Thereafter, on December 24, 2009, Dr. Goyal prepared a handwritten note which set forth the total amount of collections from January 2009 through November 30, 2009, determined 70 percent of that total collection figure, subtracted the nominal billing fee and the amount already paid to PulmoRehab, and determined that Plaintiff owed PulmoRehab $33,822.77 for the specific time period of January 1, 2009 through November 30, 2009 under the previous 70/30 compensation structure.  The entirety of Dr. Goyal's math was shown on the note.  At the end of the note, Dr. Goyal wrote "Paid in full," signed it, and sent it directly to Tom Futch, along with a check in the amount of $33,822.77.  The check for $33,822.77 itself indicated that it was "Rehab Services Final Pay[ment.]"[4]  (Ex. PX-28, Bates DPRC 000377).  Without dispute, PulmoRehab cashed that check.

15.   On February 8, 2010, DPRC sent another check to PulmoRehab, this time for $18,013.10, for the amounts collected in December 2009 and January 2010.  (Ex. PX-28, Bates DPRC 000111).  A notation on the memo line of that check read "December & January collections Paid in Full[.]"  (*Id*.)  According to Stacey Murphy, a regional reimbursement manager with Lincare Holding, the parent company of PulmoRehab, she refused to negotiate that particular check and, in fact, returned it to DPRC because the check was made out to Meridian not PulmoRehab, and because it was marked "Paid in

---

[4]   The Court notes that the actual check in the amount of $33,822.77 was not admitted into evidence.  The only evidence of the memo portion of that check is contained in a ledger that was admitted into evidence without objection by PulmoRehab.  (Ex. PX28, Bates DPRC 000377).  That exhibit shows that the memo portion of that check, in the very least, stated "Rehab Services Final Pay . . ."  The Court concludes that, based on the handwritten note submitted with the check, the memo portion of the check, at the very least, states "Rehab Services Final Payment," if not "Rehab Services Final Payment January through November 2009."

Full" when the amount tendered was not the full amount PulmoRehab believed was due and owing.

16.  Based on the facts after weighing all of the evidence, the Court concludes that the interaction between the parties establishes that DPRC's tendering and PulmoRehab's cashing of the check for $33,822.77 amounted to an accord and satisfaction of the disputed debt owed from January 2009 through the end of November 30, 2009.  By sending the email correspondence outlining DPRC's position, issuing payment by check marked "Final Pay[ment]" along with a handwritten note evidencing that amount DPRC believed was owed during the specific period of time under a 70/30 split and marked "Paid in full," DPRC provided sufficient notice that the payment was intended as full satisfaction of the disputed debt owed for January 2009 through November 30, 2009.[5]

17.  PulmoRehab's specific refusal to negotiate a subsequent check marked "Paid in Full" for December 2009 through January 2010 belies its now purported position that it lacked sufficient notice or otherwise understood DPRC's intent to fully satisfy the disputed debt owed between January 1 through November 30, 2009.  PulmoRehab's return of the subsequent check evidences its understanding of the consequences for negotiating the check.  Accordingly, DPRC satisfied its obligations under the parties' agreement for the time up until November 30, 2009.  The only amounts not accounted for are the amounts due and owing for services after November 30, 2009.

---

[5]  Meridian and/or PulmoRehab earlier agreed to write-off any disputed amount owed under the 2008 PSAs for 2008. (JX21, Bates DPRC 00301; PX26, Bates T-24).

16

18.  Based on the evidence presented, the amounts invoiced following November 30, 2009 total $27,701.06.  Accordingly, DPRC owes PulmoRehab $27,701.06 under the 2008 PSAs.

19.  With regard to DPRC's claims for breach of the Centerville and Englewood lease agreements, Plaintiffs acknowledge the fact that the pleadings, on their face, assert such claims only against Meridian.  Nevertheless, they contend that parties effectively amended the pleading by implied consent.  Pursuant to Fed. R. Civ. P. 15(b)(2):

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

"[I]f an issue is tried fully by the parties, a court or agency may base its decision on that issue and may deem the pleadings amended accordingly, even though the parties did not set forth the theory in the pleadings."  *Yellow Freight Sys. v. Martin*, 954 F.2d 353, 358 (6th Cir. 1992) (citing *MBI Motor Co., Inc. v. Lotus/East, Inc.*, 506 F.2d 709, 711 (6th Cir.1974)).

20.  Implied consent may be found only where "the parties understood the evidence to be aimed at the unpleaded issue."  *Id*.  "[E]vidence introduced at a hearing that is relevant to a pleaded issue as well as an unpleaded issue cannot serve to give the opposing party fair notice that the new, unpleaded issue is entering the case."  *Id*. (citations omitted).

21.  Here, DPRC and GYP Holdings introduced evidence of the Englewood and Centerville lease agreements, rent purportedly due pursuant to those agreements, and the purported assignment of the Centerville lease at trial without objection.  Given the dismissal of Meridian prior to trial, PulmoRehab's purported liability for rent due was the only relevant issue for which such evidence could have been introduced at trial. Accordingly, PulmoRehab's liability for rent at the Centerville and Englewood locations was raised at trial with the implied consent of the parties.  Therefore, such claims are before the Court pursuant to Fed. R. Civ. P. 15(b) as if originally raised in the pleadings.

22.  While PulmoRehab set forth its desire not to renew the Centerville lease beyond the year term, and requested GYP Holding's consent to terminate the lease early, GYP Holdings never consented to an early termination.  In fact, within weeks after the rent for August 2009 was due, Dr. Goyal emailed Tom Futch requesting the status of payment, to which Futch responded by simply referencing previous correspondence. Dr. Goyal responded by saying that GYP Holdings "certainly want[s] to accommodate [the] request to terminate the lease early[,]" but that numerous issues had to be sorted out before the request could be granted.  Dr. Goyal needed the approval of others, including non-physician partners.  GYP Holding's decision was also, in part, dependent upon whether the parties wanted to "continue the rehab clinic[,]" an issue that was consistently discussed and apparently negotiated between the parties at that time.  (PX26, Bates T-7).

23.  Thereafter, the parties continued to assess the viability of the rehab clinics, and PulmoRehab actually continued occupying the Centerville space, not only until the

end of October 2009, but all the way through January 8, 2010. (Doc. 63, PAGEID 1265). Thus, the Centerville lease issue was never resolved and continued beyond the end of the lease term until January 8, 2010.

24. PulmoRehab did not pay the $1,290 rent for August, September or October 2009, and did not pay the holdover rent for November and December 2009, and eight days in January 2010. Accordingly, PulmoRehab owes GYP Holdings $6,772.50 for rent owed at the Centerville location. (PX26, Bates T-25).

25. The Englewood oral lease agreement is removed from application of the statute of frauds on the basis of partial performance. *See Eske Properties, Inc. v. Sucher*, No.19840, 2003 WL 22880782, at *13 (Ohio App. Dec. 5, 2003) (citing *Miami Valley United Methodist Mission Soc. v. White-Dawson*, No. 17873, 2000 WL 234712, at *4 (Ohio App. Mar. 3, 2000).

26. Partial performance is sufficient to bring a contract outside the application of the statute of frauds where there have been "unequivocal acts by the party relying upon the agreement, which are exclusively referable to the agreement and which have changed his position to his detriment and make it impossible or impractical to place the parties in statu quo." *Delfino v. Paul Davies Chevrolet, Inc.*, 1 Ohio St.2d 282, 287, 209 N.E.2d 194 (1965) (citations omitted).

27. Here, DPRC partially performed the oral lease agreement by performing unequivocal action in reliance upon the agreement to their detriment. Specifically, as Dr. Goyal testified:

19

the reason we started requesting rent payment for Englewood is we initially started out with just one therapist doing rehabilitation in our Englewood office.  But we eventually grew to requiring more space and needing three therapists.  So we had to obtain additional space outside of our practice adjacent to our office where we had to pay rent.  And we had an agreement with Mr. Futch that we would share that rent for that additional space.

(Doc. 63, PAGEID 1155).

28.  In other words, DPRC leased additional space to facilitate the PSAs between the parties in reliance upon Meridian's oral agreement to reimburse DPRC $600 per month in the rent, an agreement Meridian complied with through December 2009.  In reliance upon this oral agreement with Meridian, DPRC continued to rent the Englewood space throughout 2009 and PulmoRehab continued using the space throughout that period of time.  Such performance by DPRC brings the oral lease outside the operation of the statute of frauds.

29.  PulmoRehab acquired Meridian's liability for the lease in the asset purchase agreement.  PulmoRehab's argument to the contrary is scant and is nothing more than a conclusory assertion.   The asset purchase agreement defines "assets" as "all assets and properties of [Meridian] of every kind, character and description, whether tangible, intangible, and wherever located, except for the Excluded Assets."  (JX22).  The Englewood lease is not listed among the Excluded Assets.  The asset purchase agreement defined "assumed liabilities" as:

(i) all debts, liabilities, and obligations of every kind whatsoever incurred in connection with or arising out of the Buyer's conduct of the Business or ownership, use, or possession of the Assets from and

20

after the Closing;

. . .

(iii) all liabilities, duties and obligations in respect of the contracts, agreements, and leases that constitute Assets arising or pertaining to periods commencing from and after Closing.

(Ex. JX22).

30.  Based on the foregoing broad language in the asset purchase agreement, PulmoRehab assumed liability for the lease of the Englewood facility and owes DPRC rent for 12 months in 2009 totaling $7,200.

### III.  CONCLUSION

Based on all of the foregoing, it is the judgment of the Court that DPRC breached the 2008 PSAs and owes PulmoRehab $27,701.06.  PulmoRehab breached the written lease agreement for the Centerville location and owes GYP Holdings $6,772.50. PulmoRehab also breached the oral lease agreement for the Englewood location and owes DPRC a total of $7,200.

Motions for attorney fees and costs, if any, with supporting affidavits and evidence, must be filed within 28 days from the entry of these Findings of Fact and Conclusions of Law.

**IT IS SO ORDERED**.

Date:  April 3, 2012                              *s/ Timothy S. Black*
                                                          Timothy S. Black
                                                          United States District Judge

21